[Civ. No. 845. Fourth Appellate District.—February 27, 1933.]

MARY GIBBS, Respondent, v. NETTIE L. SEEGER et al., Appellants.

124

D. A. Knapp for Appellants.

McAdoo, Neblett & Clagett, McAdoo & Neblett and B. H. Neblett for Respondent.

BARNARD, P. J.—The defendants have appealed from a judgment foreclosing a mortgage given by them to Wm. G. McAdoo and R. T. Colter, and assigned to the plaintiff. This mortgage was given as a part of the transaction described in the case of *Wooten* v. *McAdoo,* 110 Cal. App. 48 [293 Pac. 694]. The appellants owned a small lot (25x50 feet) in Huntington Beach, which they leased to McAdoo and Colter in connection with a similar lease of another lot of the same size owned by other parties, for the purpose of drilling for oil on the two lots thus leased, by means of power furnished and brought from a plant used in drilling and operating another well, which throughout the proceedings is called the "first well", which was located across the street from the property owned by appellants and which was controlled by the lessees. At the time these leases were made, the lot owned by the appellants was encumbered by a mortgage for $2,500, and, by agreement of the parties, McAdoo and Colter paid off this $2,500 and in lieu thereof the appellants executed and delivered to them the mortgage here in question. Under the lease referred to, as a part of the rental, the appellants were to have one per cent of the proceeds of the oil produced from the above-mentioned first well, located across the street. Up to the time that lease was canceled by a quitclaim deed, as provided for therein, a part of the proceeds of this one per cent of the production referred to was paid on this mortgage, reducing the principal to $1194.47. After the lease was canceled this one per

cent of the proceeds from the oil produced from the first well was no longer paid to the appellants, the appellants made no further payments upon this mortgage, and this foreclosure action followed.

The appellants state that there were but two issues before the trial court and raise the same two points on this appeal. Appellants thus state these two issues: "One was whether the question of fraud was *res judicata* by reason of the decision concerning the lease. The other was whether the language and facts surrounding the one per cent clause constituted a transfer of a perpetual interest in the first well, or whether it was a mere temporary privilege that terminated with the quitclaim deed covering appellants' land."

The first issue thus referred to was not presented to or passed upon by the trial court. While it appears probable that any question of fraud was *res judicata,* as the only misrepresentations alleged are the same allegations which were held to be not sufficient to establish fraud in *Wooten* v. *McAdoo, supra,* such an issue was neither presented to the trial court nor is it sufficiently raised here to enable such a point to be decided. The only thing called to our attention is one question asked of Mrs. Seeger, as to whether she had consulted anyone in connection with this transaction. An objection was made that this was not within the issues raised by the pleadings. In passing upon this objection the court called attention to the fact that the pleadings did not support any claim for misrepresentation. No ruling was made in respect to any matter as having been previously decided. Counsel for appellants remarked: "That disposes of the question of fraud, and we accept the ruling of the court as a matter of record on the point." The trial then proceeded upon the sole question as to whether the appellants were entitled to a perpetual interest in the first well, amounting to one per cent of the proceeds therefrom. While appellants argue that it is fair to assume that there might have been other conversations aside from those passed upon in the previous case, no attempt to offer evidence of the same was made at the trial and no such evidence is here pointed out, the only matters apparently relied upon being the same leases and matters passed upon in the case of

*Wooten* v. *McAdoo, supra.* While the actual ruling made by the court is not here attacked, we may say that the court's ruling was apparently correct, as the only allegations of fraud set up by the appellants in their pleadings did not go to the question as to whether the mortgage was obtained by fraud, but went to and were incidental to the main defense raised, and what is the gist of the entire pleadings, that there was an agreement that the mortgage should be paid from the amounts coming to the appellants from the one per cent of the proceeds of the first well.

The second issue stated by the appellants as presented to the trial court is the only point properly raised here and, so far as the record shows, is the only point properly presented to the trial court. In support of this contention our attention is called to no evidence of any agreement between the parties other than as set forth in the lease and in the mortgage here involved, and appellants rely entirely upon the claim that a proper construction of the language used in the lease necessarily compels the conclusion that the one per cent of the proceeds of the first well, across the street, was given to the appellants as a bonus for the execution of the lease in question, that the same was not a part of the rental for the lot leased, that the cancellation of the lease through a quitclaim deed, as provided for therein, had no effect upon appellants' perpetual interest in the first well, and that this percentage of the proceeds of the first well, if paid over, would have been sufficient to have paid off this mortgage.

The lease in question provided that "the lessee shall pay as rental or royalty for the use of said land owned by lessors 2 per cent of all the oil produced and saved from said second well, and 1 per cent of all the oil produced and saved from the first well to be drilled upon the above described premises, said payment to be made in money or in kind at lessor's option". The lease further provides: "The lessees may at any time before discovery of oil on the demised premises, quitclaim the said property, or any part thereof, to the lessors, their successors or assigns, and thereupon all rights and obligations of the parties hereto, one to the other shall thereupon cease and determine as to the premises quitclaimed."

Before oil was discovered on the leased premises the lessees abandoned the project and quitclaimed the property to the appellants. While the appellants concede that the one per cent of the oil produced from the first well is named in the lease as a part of the rental or royalty for the use of the land leased, they argue that since this provision for one per cent of all the oil produced and saved from the first well contains no limitation as to time, it is a "downright grant" of this percentage of such oil for all time unless otherwise limited in the lease. It is then urged that there is no such limitation in the lease and that the other clause therein providing that in the event the property should be quitclaimed, then "all rights and obligations of the parties . . . shall thereupon cease and determine *as to the premises quitclaimed*" has no relation to the provision giving to the lessors one per cent of the oil produced from the first well. It is argued that the clause quoted discloses an intention that upon the quitclaiming of the property, the obligation of the parties should cease in so far as the premises quitclaimed were concerned, but that this had no effect upon the obligation of the parties in connection with the first well, which was situated upon land other than that quitclaimed. Therefore, it is argued, the interest in the proceeds of the first well given to the appellants must be interpreted as being a bonus as distinguished from any part of the rental of the land leased.

We think this interpretation of the lease cannot be sustained. The lease does not contain the word "bonus" nor any language equivalent thereto. There is no uncertainty in the language used and it is plainly provided that the one per cent of the oil produced from the first well is to be paid to the lessors as rental or royalty for the use of the land leased. It is no more necessary that the length of time during which this provision shall govern should be specifically stated in that particular clause of the lease than that a similar limitation should be in the same place expressly stated in reference to the two per cent of any oil to be produced from the second well, which was to be located on the property leased. Nor is there anything in the quitclaim provisions of the lease which changes the situation. It is particularly provided that the lessees may, before the discovery of oil on the leased premises quitclaim the property *or any*

*part thereof* to the lessors, and that thereupon all rights and obligations of the parties *one to the other* shall cease. The additional clause "as to the premises quitclaimed" unquestionably refers to that part, or all, of the leased premises which might thus be quitclaimed, and the same was neither intended to, nor does it, preserve the interest of the lessees in the product of the first well. In addition to all other considerations, taking the lease as a whole, it appears that the *only* interest given to the lessors in the product of the first well was given by way of rental for the use of the property leased, and when the rights and obligations of the parties ceased as to the property leased, they ceased in their entirety. The contract made by these parties was reduced to writing and nothing may be added thereto. (*Smith-Booth-Usher Co. v. Los Angeles Ice etc. Co.*, 175 Cal. 136 [165 Pac. 430].)

The judgment appealed from is affirmed.

Marks, J., and Jennings, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 27, 1933.